No. 24-1719

In the United States Court of Appeals
for the Third Circuit
────────────────

United States of America,
*Appellee.*

– *v.* –

James Bost,
*Appellant.*

────────────────

On appeal from final judgment of the United States District Court
for the Western District of Pennsylvania, No. 21-cr-30, (Weigand, J.)

────────────────

**BRIEF OF COURT-APPOINTED AMICUS CURIAE NATIONAL
ASSOCIATION OF CRIMINAL DEFENSE LAWYERS**

────────────────

Lisa A. Mathewson
  *Mathewson Law LLC*
  *1617 John F. Kennedy Blvd.,*
  *Suite 2027*
  *Philadelphia, PA 19103*
  *(215) 399-9592*
  *lam@mathewson-law.com*

Michael B. Kimberly
  *Winston & Strawn LLP*
  *1901 L Street NW*
  *Washington, DC 20036*
  *(202) 282-5096*
  *mkimberly@winston.com*

Alana Cohen\*
Scott Shimizu\*
  *Winston & Strawn LLP*
  *300 North LaSalle Drive*
  *Chicago, IL 60654*
  *(312) 558-5600*

*Attorneys for Amicus Curiae, National Association of Criminal
Defense Lawyers*

*\*Counsel not admitted to Third Cir. Bar*

# RULE 26.1 CORPORATE DISCLOSURE

The National Association of Criminal Defense Lawyers is a nonprofit voluntary professional bar association. It has no parent organization and does not issue stock.

# TABLE OF CONTENTS

Table of Authorities ........................................................................ iii

Interests of Amicus Curiae ............................................................. 1

Argument ........................................................................................ 2

    A.    An unbounded inquiry into the accused's propensity for gun violence would not be administrable. ..................

    B.    An unbounded inquiry would invite a host of thorny constitutional challenges. ............................................... 4

Conclusion ....................................................................................... 9

Required Certifications ................................................................ 11

# TABLE OF AUTHORITIES

**Cases**

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ................................ 8

*Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984)..
................................................................................................. 5

*Brady v. Maryland*, 373 U.S. 83 (1963) ........................................... 3

*City of Chicago v. Morales*, 527 U.S. 41 (1999) .............................. 7

*Counterman v. Colorado*, 600 U.S. 66 (2023) ................................ 7

*Descamps v. United States*, 570 U.S. 254 (2013) ........................... 4

*Giglio v. United States*, 405 U.S. 150 (1972) .................................. 3

*New York State Rifle & Pistol Association v. Bruen*,
    597 U.S. 1 (2022) .......................................................... 2, 4, 6

*Old Chief v. United States*, 519 U.S. 172 (1997) ............................ 6

*Russell v. United States*, 369 U.S. 749 (1962) ................................ 8

*United States v. Bean*, 537 U.S. 71, 77 (2002) ................................ 3

*United States v. Dobbin*, 147 F.4th 333 (3d Cir. 2025) ................... 4

*United States v. Menendez*, 831 F.3d 155 (3d Cir. 2016) ............ 3-4

*United States v. Rahimi*, 602 U.S. 680 (2024) ........................... 2, 4

**Statutes**

18 U.S.C. §922(g)(1) ............................................................... passim

18 U.S.C. §922(g)(3) ......................................................................... 7

18 U.S.C. §925(c) .............................................................................. 3

# INTERESTS OF AMICUS CURIAE

The National Association of Criminal Defense Lawyers (NACDL) is a nonprofit voluntary professional bar association that works on behalf of criminal defense attorneys to ensure justice and due process for those accused of crime. Founded in 1958, it has a nationwide membership of many thousands of direct members, and up to 40,000 with affiliates. NACDL's members include private criminal defense lawyers, public defenders, military defense counsel, law professors, and judges. It is dedicated to advancing the proper, efficient, and impartial administration of justice.

NACDL submits this brief in accordance with the Court's November 18, 2025 Order appointing it amicus curiae.[1] Because NACDL's institutional mission is addressed to criminal law, and it believes the interests and legal analysis at issue may differ when an individual files a civil suit to restore his or her right to bear arms, it has elected not to submit a separate brief in *Williams v. Attorney General*

---

[1] NACDL certifies that no counsel for a party authored any portion of this Brief; no party nor party counsel contributed money toward preparing or submitting this Brief; and no person other than counsel to the amicus curiae contributed money toward funding or preparing this Brief.

(No. 24-1091), NACDL nevertheless appreciates the Court's grant of leave to do so.

## ARGUMENT

The Court has directed NACDL and the parties to address whether, when evaluating an as-applied Second Amendment challenge to a Section 922(g)(1) charge, courts are limited to considering the predicate conviction underlying the charge, or instead may consider other indicators of dangerousness without limitation, including conduct post-dating the charged offense.

Conceptually, we understand the question this way: To satisfy the Second Amendment, must the government show that the predicate conviction underlying a Section 922(g)(1) charge is *itself* the kind of offense that justifies disarming and punishing the offender according to history and tradition; or may instead the government show only that the defendant is a physically "dangerous" person, based on facts apart from the predicate offense, to justify disarmament and punishment? In other words, is the as-applied inquiry addressed to the charged offense, or instead to the offender as a person?[2]

---

[2] NACDL recognizes that the Court may also confront questions about what it means to examine the "predicate offense," but understands the Court's current question to address the use of factors beyond it.

NACDL respectfully submits that courts deciding a criminal defendant's as-applied Second Amendment challenge should be limited to evaluating the application of the charged statute to the case before them—that is, to the elements of the charged offense. In Section 922(g)(1) prosecutions that means courts should evaluate the convictions the government cites as predicates for the charge. The Second Amendment question is whether punishing the defendant under Section 922(g)(1) is consistent with the Nation's history and tradition of permanently disarming individuals who have committed particular crimes. The answer cannot turn on whether the accused has a free-floating character of being physically dangerous and thus subject to disarmament.

Not only is this conclusion required by *United States v. Rahimi*, 602 U.S. 680 (2024) and *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), but to hold otherwise would invite sweeping mini-trials in countless criminal cases. That would not be administrable, and it would invite a raft of thorny constitutional challenges.

### A. An unbounded inquiry into the accused's propensity for gun violence would not be administrable.

As a starting point, courts are ill-equipped to determine when a criminal defendant is "likely to act in a manner dangerous to public safety," because they are institutionally unable to conduct the "neutral, wide-ranging" inquiry into an individual's "background" that finding requires. *United States v. Bean*, 537 U.S. 71, 77 (2002) (addressing 18 U.S.C. §925(c)). Assigning that role to the courts when the government has haled a citizen into court to answer criminal charges the Second Amendment may bar would impair the fair administration of justice.[3]

The burden of an open-ended inquiry on court resources would be prohibitive. Due process would require giving the defendant fair notice of any facts that the court will consider, and a meaningful opportunity to contest them through cross-examination and defense evidence. The government would have disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). Troves of information in the hands of third parties (*e.g.*, neighbors, social media platforms, long-ago teachers) may be relevant, tracing back years and potentially decades. The sprawling mini-trials an unbounded inquiry would spawn would be time-consuming enough.

---

[3] Whether different considerations apply when an individual seeks prospective relief, as in *Bean*, is beyond the scope of this Brief.

*See generally United States v. Dobbin*, 147 F.4th 333, 343 (3d Cir. 2025)(noting need to avoid "lengthy and cumbersome collateral trials"). The investigation and motion practice that inevitably would precede them would be even worse.

Nor would the enormous expenditure of resources be likely to yield reliable results. Law-enforcement and court records are typically preserved for longer than other types of records. But only a tiny subset of factual assertions that they contain are ever subjected to adversary testing. And a defendant who had no incentive—or, indeed, a disincentive (*Descamps v. United States*, 570 U.S. 254, 270 (2013))—to challenge their accuracy contemporaneously will have lost the opportunity to counter them meaningfully years later.

Given only a hazy and incomplete picture of a defendant's character, a district court would necessarily struggle to assess physical dangerousness with the rigor *Rahimi* and *Bruen* require to permanently disarm and punish a citizen. Doing so in a way that yields the consistent results necessary to maintain public confidence in the courts' impartial protection of the citizenry would be impossible.

And these problems would not be limited to district courts. De novo review is required for findings of "constitutional fact," meaning facts whose "determination is decisive of constitutional rights." *United*

5

*States v. Menendez*, 831 F.3d 155, 164 (3d Cir. 2016). To date the Supreme Court has applied that appellate standard only in the First Amendment context. *Id.* But its logic applies equally when "the question is one of alleged trespass across the line between [bearing arms] unconditionally guaranteed and [bearing arms] which may legitimately be regulated." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 508 (1984). Thus, the administrability problems an open-ended inquiry creates would flow upward to this Court, too.

Finally, an open-ended inquiry would threaten the even-handed administration of justice, by imposing unacceptable trade-offs on defendants who may otherwise seek a court's protection from an unconstitutional prosecution. In a concrete sense, subjecting Second Amendment challenges to a limitless and resource-intensive inquiry would disadvantage defendants with retained counsel and finite economic resources, who could not afford to mount an as-applied challenge *and* defend a case at trial. Less concrete but no less unfair, defendants would know that the price of asserting their Second Amendment right pretrial is converting the judge from a neutral arbiter into a fact-finder examining extraneous prejudicial information of a sort neither jury nor jurist would ever hear—irremediably, even if implicitly,

6

prejudicing the court's view of the defendant going forward. *Cf. Old Chief v. United States*, 519 U.S. 172, 180 (1997).

The Court should reject a test that would make asserting Second Amendment rights so costly.

### B. An unbounded inquiry would invite a host of thorny constitutional challenges.

Not only would an unbounded inquiry into dangerousness be unadministrable, it would invite a host of constitutional challenges that a properly limited inquiry would avoid.

The Second Amendment overlay on Section 922(g)(1), which limits its application to people convicted of an analogous "historical precursor" offense (*Bruen*, 597 U.S. at 29-30), arguably functions like a narrowing construction of a statute: the narrow interpretation necessary to save the statute from unconstitutionality defines the elements the government must charge and prove. *See, e.g.*, *Skilling v. United States*, 561 U.S. 358, 404 (2010); *United States v. Yung*, 37 F.4th 70, 80 (3d Cir. 2022). Adopting an open-ended approach to the as-applied constitutionality of §922(g)(1) would, on that theory, open the door to defense challenges including the following:

**Fair notice.** Fair notice issues frequently arise in the First Amendment context, to which the Supreme Court has "repeatedly compared the right to keep and bear arms." *Bruen*, 597 U.S. at 24. A

7

defendant at a loss to understand why Section 922(g)(1) applies to him may well complain that he was left to "speculate," "at peril of life, liberty or property" about when the statute will or will not subject him to punishment. *City of Chicago v. Morales*, 527 U.S. 41, 58 (1999). He certainly could not have known in advance that the government's later rooting around through a lifetime pockmarked with dirty laundry might turn up a few bad facts a court may accept as sufficient to show "dangerousness" under an unbounded, totality-of-the-circumstances test. He may find further support in First Amendment precedent warning that uncertainty about a statute's reach may cast a chill, inducing individuals to avoid exercising their right to bear arms out of uncertainty and fear that "the legal system will err, and count [gun possession] that is permissible as instead not." *See Counterman v. Colorado*, 600 U.S. 66, 75 (2023).

**Grand jury clause.** Consider a case in which the government prosecutes under §922(g)(1) an ongoing drug user with an old, non-violent conviction, relying on social media posts showing him smoking—not so different from the scenario that Mr. Bost finds himself in. The problem is that a different code provision, Section 922(g)(3), criminalizes firearm possession by a "user of . . . any controlled substance."

Again by analogy to a narrowing statutory construction that avoids constitutional infirmity, the defendant may argue that upholding the application of Section 922(g)(1) to him based on facts the grand jury did not find probable cause to charge violates the Grand Jury Clause. *See Russell v. United States*, 369 U.S. 749, 765-766 (1962). An open-ended approach to this Court's question open the door to the argument that the government is sidestepping the Grand Jury Clause, and to challenges from defendants who assert that Fifth Amendment right.

**Right to trial by jury.** The same analysis creates another potential constitutional challenge: the same defendant may object that the government is using facts not "charged in an indictment, submitted to a [trial] jury, and proven beyond a reasonable doubt" to expose him to conviction and punishment. *Apprendi v. New Jersey*, 530 U.S. 466, 473 (2000). This constitutional challenge too would be invited by leaving the boundaries of as-applied Second Amendment challenges unconstrained by the charged statute.

## CONCLUSION

The Court may avoid these administrability problems and layers of potential constitutional complications simply by recognizing that as-applied challenges challenge the *application* of the charged statute in a

9

given case—making the elements of the charged statute the controlling boundary of the as-applied inquiry. In a Section 922(g)(1) prosecution that means the government must show that the predicate conviction itself would justify permanently disarming and punishing the offender according to history and tradition. Permitting an open-ended inquiry into the defendant's character would impair the fair administration of justice and undermine the exercise and assertion of Second Amendment rights.

Respectfully submitted,

| | |
|---|---|
|   *Lisa A. Mathewson*          <br> Lisa A. Mathewson <br>   *Mathewson Law LLC* <br>   *1617 John F. Kennedy Blvd.,* <br>   *Suite 2027* <br>   *Philadelphia, PA 19103* <br>   *(215) 399-9592* <br>   *lam@mathewson-law.com* | *Michael B. Kimberly*      <br> Michael B. Kimberly <br>   *Winston & Strawn LLP* <br>   *1901 L Street NW* <br>   *Washington, DC 20036* <br>   *(202) 282-5096* <br>   *mkimberly@winston.com* <br><br> Alana Cohen* <br> Scott Shimizu* <br>   *Winston & Strawn LLP* <br>   *300 North LaSalle Drive* <br>   *Chicago, IL 60654* <br>   *(312) 558-5600* |

*Attorneys for Amicus Curiae, National Association of Criminal Defense Lawyers*

**Counsel not admitted to Third Cir. Bar*

December 18, 2025

## CERTIFICATE OF BAR MEMBERSHIP

I certify that I am a member in good standing of the bar of the U.S. Court of Appeals for the Third Circuit.

/s/ *Lisa A. Mathewson*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g) and Third Circuit Rule 31.1(c), the undersigned certifies that this brief complies:

(i) with the word limit set by the Court's November 18, 2025, appointment order—including footnotes and excluding the parts of the brief exempted by Rule 32(f) and Third Circuit Rule 29.1(b)—because it contains 1635 words;

(ii) with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it is typeset in 14-point Century Schoolbook;

(iii) with Third Circuit Rule 31.1(c) because it is identical to the text of the paper copies and because the electronic file was scanned with a commercial anti-virus software program.

/s/ *Lisa A. Mathewson*

Dated: December 18, 2025

**CERTIFICATE OF SERVICE**

I certify that on December 18, 2025, I caused the foregoing brief to be filed with the clerk of the court via electronic filing. All counsel of record will receive service via the Court's electronic filing system.

/s/ *Lisa A. Mathewson*